UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DEBRADRE D. JACKSON,

                    Petitioner,

                                              Case No. 17-cv-433-pp

        v.

PAUL S. KEMPER,

                    Respondent.

**ORDER DENYING PETITION FOR WRIT OF *HABEAS CORPUS* (DKT. NO. 1),
DISMISSING CASE AND DECLINING TO ISSUE CERTIFICATE OF
APPEALABILITY**

On March 24, 2017, the petitioner, who has been released on extended

supervision and is representing himself, filed a petition for writ of *habeas*

*corpus* under 28 U.S.C. §2254 challenging his December 10, 2014 conviction in

Milwaukee County Circuit Court for substantial battery as a repeat offender.

Dkt. No. 1 at 2. On August 7, 2017, the court screened the petition, allowed

the petitioner to proceed on his claims and ordered the respondent to answer

or otherwise respond. Dkt. No. 6. On November 29, 2017, the petitioner filed

his supporting brief. Dkt. No. 14. The respondent filed his opposition brief on

February 15, 2018. Dkt. No. 16. The petitioner has filed a reply. Dkt. No. 17.

I.      **Background**

        A.      <u>Underlying State Case</u>

        On January 21, 2014, the State charged the petitioner with one count of

robbery, one count of aggravated battery and one count of obstructing an

1

officer. Dkt. No. 11-2 at 50-51. The trial court eventually dismissed the obstructing charge. Dkt. No. 11-4 at 121-22. The State charged the other counts as domestic abuse offenses. Dkt. No. 11-2 at 50-51. The complaint indicated that the victim, C.B., was the petitioner's ex-girlfriend. Id. at 48. It stated that "shortly after midnight" on January 10, 2014, the petitioner "pushed [C.B.] to the ground and punched her in the face," "grabbed a glass vase and struck her repeatedly in the forehead near her eye," demanded money, threatened to kill her, took money and fled. Id.

The petitioner represented himself at trial. Dkt. No. 11-4 at 118. On the morning of the first day, while the court addressed preliminary matters with the parties, the prosecutor, Attorney Michael Schindhelm, stated that "it appeared" that he "might be doing this trial without [C.B.]'s testimony;" then-circuit Judge Rebecca Dallet stated that she did not think C.B. was present in court. Id. at 117, 119. The petitioner asked to make a motion to dismiss in light of C.B.'s absence:

> THE [PETITIONER]: I want to file this motion to dismiss, Your Honor. Right now.
>
> THE COURT: Well, why would I dismiss that, sir? I already dismissed 3.
>
> THE [PETITIONER]: Count 2 doesn't have victim here to testify against me, and they haven't established anybody who can say that I was on this scene or anything. I mean, piece of evidence that I was ever there. They have made—They don't have any fingerprints or any door knobs, drinking cups.
>
> And they are trying to use the victim's statement which clearly states that she was intoxicated when she gave them their initial statement. Had no other statements from her.

2

Id. at 122. The court asked the State how it planned to proceed without an eyewitness. Id. at 122-23. Attorney Schindhelm explained that he had 911 call recordings that he intended to use with corroborating police and medical reports. Id. at 123. The court noted that it had not ruled on the admissibility of "any 9-1-1 tape yet." Id. It turned to the petitioner, asking if he would bring any motion regarding the 911 calls. Id. at 124. The petitioner responded:

> THE [PETITIONER]: I don't contest it, the 9-1-1 call.
>
> THE COURT: You don't contest them playing the 9-1-1 call?
>
> THE [PETITIONER]: No because it doesn't—It doesn't state—She—I heard it, and she say that—She never said me. They never—They don't have any evidence. Like I said, I beat her with—She said I beat her with a vase, okay? I was in custody. She had the evidence, haven't produced my fingerprints off this vase. Didn't even attempt to introduce fingerprints off this vase.
>
> She said we was drinking. They got pictures of and bottle of fifth of Absolute and she say was drinking. They haven't even processed fingerprints on this to establish that I even at the residence. I just don't think suffer any injuries, so I move to dismiss this case.

Id. at 124-25. The court said that while it would not be dismissing the case, it would consider the admissibility of the 911 call:

> THE COURT: . . . I will listen to the 9-1-1 call, but I will take under advisement a motion even though [the petitioner]'s not formally making that because he is pro se, if it's evidence that should not be played because it's not—because it's hearsay or it is not—otherwise not appropriately played in a legal fashion by the rules of the court. I—I don't want it to be an issue that comes back potentially later and certainly, shouldn't be used against [the petitioner] if that's the case.

Id. at 125. At that point, the court noted its belief that the call would likely "be appropriate to introduce and that there's both Crawford and hearsay exceptions," but deferred a final ruling. Id.

3

The court took a recess to address other matters, id. at 141; when it

returned, the court again addressed the 911 calls:

> THE COURT: . . . The first thing is I did listen to the phone calls.
> And you were not objecting to the calls, right?
>
> THE [PETITIONER]: No.
>
> THE COURT: And it's multiple calls made allegedly by [C.B.].
>
> THE [PETITIONER]: It was just two call-backs.
>
> . . .
>
> THE COURT: Okay. And I think, listening to them, I don't see any
> issues, although I really do need to leave it up to [the petitioner],
> who is representing himself. And he is not objecting.
>
> . . .
>
> THE COURT: . . . So that will be played, and [the petitioner] is not
> objecting.

Id. at 142-43. After the court denied another request to dismiss the case, id. at

154, the petitioner expressed a concern regarding C.B.'s absence:

> THE [PETITIONER]: . . . Is the victim here?
>
> THE COURT: I don't think so.
>
> THE [PETITIONER]: Any reason why? Because she wasn't here for
> the preliminary either.
>
> THE COURT: I don't know why.
>
> THE [PETITIONER]: Is there any reason why I can't cross-examine
> my accuser under the Sixth Amendment?

Id. at 155. The court expressed its understanding of the petitioner's concern,

and clarified that it was not yet "allowing in any statements that [C.B.] ha[d]

4

made that [weren't] otherwise covered by an exception to hearsay." Id. The

court continued:

> THE COURT: . . . I am not allowing any of her statements in to the
> police. But things like the 911 call, which you wanted in, and then
> these statements have specific exceptions to that. They deal with
> medical diagnosis and treatment, and they deal with emergency
> calls. And those are things that don't—aren't testimonial, that aren't
> for the purpose of testifying, so therefore they're not covered by the
> Sixth Amendment right. But I am not allowing in any other
> statements she made, because you do have a right to cross-examine
> your accuser.

Id. at 156. The petitioner then argued that the court lacked jurisdiction

because no victim appeared in court. Id. The court responded that "[t]hese are

arguments you can make to the jury." Id. At that point, the petitioner raised a

different argument regarding the 911 calls:

> THE [PETITIONER]: Since—well, since—if she's not here, then I
> move to suppress the 911 call too then.
>
> THE COURT: Okay, we talked about the 911 call. You didn't have
> any objection to the playing of the 911 call. Now you are saying you
> do?
>
> THE [PETITIONER]: Yeah, because it pertains to a statement from
> her.
>
> THE COURT: Well, I listened to it, and I did that for the reason in
> case you did have an objection. There are two pieces to my ruling on
> the 911 call. The first piece is that I have to make a decision under
> Crawford, which is the case that deals with that Sixth Amendment
> right. And I have to make a decision about whether or not this call
> itself was testimonial. There is case law that talks about 911 calls
> made for the purpose of help, someone seeking help, whether those
> are covered. And that case is Davis v. Washington, [547 U.S. 813
> (2006)]. That case says those calls do not fall within the Sixth
> Amendment right because they are not testimonial. They are not
> offered for the truth of testimony, they're made for the purpose of
> getting help. I think that the caller in those calls was asking for help.
> She was talking about bleeding. She's talking about being afraid to
> walk out of her apartment. She's asking for help. She doesn't know

5

who the person who did this to her is. And she is asking for help. I don't think they're covered by <u>Crawford</u> in terms of being testimonial and being suppressed because of that. And I do think there are hearsay exceptions. That is the second piece the court looks at. And hearsay exceptions are excited utterance. She's crying, she's distraught. And also potentially present s[e]n[s]e impression. She's describing what is going on, which is that she's bleeding and needs medical attention. So I think that they come in even without her here, [] to the level that I allowed with that one call from the one operator to the other not coming in.

<u>Id.</u> at 157-58. The petitioner objected to the admission of a computer-aided dispatch (CAD) report; the court allowed the prosecutor to establish the report's timing and nature as a record kept in the ordinary course of business, but excluded the dispatcher's hearsay statements within it. <u>Id.</u> at 162-64.

At the end of the day, the court gave preliminary jury instructions. <u>Id.</u> at 217. The court explained that because the petitioner had entered not guilty pleas to both counts, the State must prove every element of each offense beyond a reasonable doubt. <u>Id.</u> at 224. After outlining the elements of robbery under Wisconsin law, the court instructed the jury regarding battery:

Battery, as defined in Section 940.19(6) of the Criminal Code of Wisconsin, is committed by one who intentionally causes bodily harm to another by conduct which creates a substantial risk of great bodily harm.

Before you may find the defendant guilty of this offense, the state must prove by evidence which satisfies you beyond a reasonable doubt that the following four elements were present: One, the defendant caused bodily harm to [C.B.] "Cause" means the defendant's act was a substantial factor in producing the bodily harm. "Bodily harm" means physical pain or injury, illness, or any impairment of physical condition; two, the defendant intended to cause bodily harm to [C.B.] "Intend to cause bodily harm" means the defendant had the mental purpose to cause bodily harm to another human being or was aware that his conduct was practically certain to cause bodily harm to another human being; three, the defendant's conduct created a substantial risk of great bodily harm. "Great

6

bodily harm" means serious bodily injury. Injury which creates a substantial risk of death or which causes serious permanent disfigurement or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury is great bodily harm; and, four, the defendant knew that his conduct created a substantial risk of great bodily harm.

You cannot look into a person's mind to find intent and knowledge. Intent and knowledge must be found, if found at all, from the defendant's acts, words, and statements, if any, and from all the facts and circumstances in this case bearing upon intent and knowledge.

If you are satisfied beyond a reasonable doubt that all four elements of this offense have been proved, you should find the defendant guilty of Count 2. If you are not so satisfied, you must find the defendant not guilty of Count 2.

Id. at 225-27. The court further instructed the jury about the presumption of innocence, reasonable doubt and that "[t]he burden of establishing every fact necessary to constitute guilt is upon the state." Id. at 227-28.

After the jury left the courtroom, the petitioner raised a motion based on insufficient evidence:

THE [PETITIONER]: I have a motion on insufficient evidence. We never heard about that, did we?

THE COURT: A motion based on insufficient evidence?

THE [PETITIONER]: Yes.

THE COURT: I can look in the file.

THE [PETITIONER]: Like September 24th.

THE COURT: All right. Typically what happens is the jury—that would be a motion you would make later if a jury were to convict you. Because the evidence hasn't been presented yet, so it's something I wouldn't address. There is a number of different—there is mandamus, there is acquit, that I don't quite understand.

7

. . .

> THE COURT: But as far as any insufficient evidence, the jury is gonna hear the evidence. They're gonna make a decision. If there is a conviction, that is the kind of motion that is made at the end. It can be made at the end of the state's case. If there is insufficient evidence, you will get a chance to move to dismiss. And if there is a conviction, you will get a chance to raise that issue later on appeal or post-conviction motion. Okay. This was a motion to dismiss Information. We talked about that, and we talked about the motion in limine.

Id. at 233-35.

On the morning of the second day of trial—before the jury entered and before opening statements began—the court addressed more preliminary issues with the parties. Id. at 239-245. The prosecutor asked the court to admit a transcript of a 911 call. Id. at 245. The petitioner objected, explaining that the transcript reflected the correct spelling of his name, whereas on the recording, the caller was "mumbling [his] name." Id. at 246. The court agreed with the petitioner, clarifying that the name "[was not difficult to hear in the sense of volume, but . . . because of the way that the alleged victim is talking." Id. at 246. The court noted that neither it nor the petitioner had had sufficient time to review the transcript to determine whether the petitioner agreed that the words in the transcript were the words uttered by the caller. Id. She clarified that:

> THE COURT: . . . that is what I really ruled yesterday is it's just too late at this point to expect both [the petitioner], and it would be the same if he had an attorney, and expect the court to be able to rule on any issues that the two of you have between what is being said. The jury can hear it. They will be the judges of what they hear. I am not gonna let a transcript in.

8

Id. at 246-47. The parties also stipulated that the petitioner's name was Debradre Jackson. Id. at 260-61.

After opening statements, the State called its first witness, Cindy Wirth. Id. at 267. Ms. Wirth was a telecommunicator for the Milwaukee Police Department. Id. She testified that when a police telecommunicator answers an emergency call, the telecommunicator begins to enter information into the CAD system. Id. at 267-69. She described the CAD system as a computer program that allows the telecommunicator to notate a caller's "address, their name, their phone number, and exactly what is going on at that particular time, the reason they're calling." Id. She stated that depending on how a caller answers the relevant questions, the order of the information can get "mixed up," so a telecommunicator "put[s] it where it makes sense. But it is practically word for word what they are saying." Id. at 270. She said that emergency calls are also recorded. Id. at 172.

Wirth testified that at 12:31 a.m. on January 10, 2014, she answered an emergency call, the caller hung up, the caller called back within about five minutes, a coworker took that call and the coworker finished entering the CAD information. Id. at 275. With the court's permission, the State played Exhibit 2—recordings of the two emergency calls—for the jury. Id. at 280-81. The petitioner's questioning clarified that Ms. Wirth's coworker, and not Ms. Wirth, took the caller's name. Id. at 282-83.

The State called Dr. Matthew Tews. Id. at 283. After a discussion with the parties, the court decided that the State would ask Dr. Tews foundational

9

questions outside the presence of the jury. Id. at 289-90. After the jury returned, Tews testified that he was an attending physician involved with the treatment of C.B. on January 10, 2014. Id. at 296-300. He explained that C.B. had lacerations to her face and swelling and bruising on her head. Id. at 300. Referring to medical records, Tews recalled that C.B. said "she was assaulted at about 1:00 a.m., struck multiple times in the head" with a glass vase and lost consciousness. Id. at 301-02. He stated that after further testing and examination, C.B. received nine stitches and medical glue on her face. Id. at 306-07. On cross-examination, the petitioner questioned Tews regarding C.B.'s upset reaction after hospital staff declined to prescribe her pain medication. Id. at 309-11. Tews was unable to conclude from written records whether C.B. had substance abuse issues, but clarified that the medical records indicated C.B. had denied having such an issue. Id. at 311-12.

During a recess, the State asked the court to instruct the jury on substantial battery—a lesser included offense of aggravated battery. Id. at 314-15. Attorney Schindhelm thought that "a reasonable jury could feel that there wasn't enough evidence of a substantial risk of the great bodily harm, and—but yet feel that there was sufficient evidence of the injury requiring the stitches and the substantial harm." Id. at 315-16. The court discussed the difference between the two offenses:

THE COURT: I am reading the substantial battery instruction . . .

. . .

THE COURT: It [] requires substantial bodily harm, which is defined as, in this case, stitches.

10

. . .

> THE COURT: It would require intent to cause bodily harm. Not
> substantial, but just bodily harm. Those are the two elements. Those
> elements are different from the elements already here under
> aggravated battery, which requires causing bodily harm, intend to
> cause it, conduct that created a substantial risk of great bodily
> harm. And this is defined differently. And then knowledge elements.
> . . . the state is correct [] that under 939.66(2m) it is a lesser included
> offense because it is a less serious or equally serious type of battery.
> So the state is allowed to ask for a lesser included as long as the
> evidence could show the one and not the other.
>
> THE [PETITIONER]: Okay.

Id. at 318-19. The court expressed the view "that the evidence could show
either one potentially," explained that the instruction was appropriate, and
clarified that the jury would not be able to convict the petitioner of both
aggravated and substantial battery. Id. at 319-20. Because it had not yet heard
all the evidence, the court anticipated it would provide instructions for both the
charged and the lesser included offenses, but deferred that ruling for the
moment. Id. at 320.

At the beginning of the third day of trial, the State called Erik Smith, an
officer with the Milwaukee Police Department. Id. at 327-38. Officer Smith
testified that he and his partner, Joe Saric, responded to a "call for service"
shortly after 12:00 a.m. on January 10, 2014. Id. at 328-29, 32. He stated that
when he arrived at the caller's location, he met the caller—C.B. Id. at 331.
Smith described C.B. as having a severe, bleeding laceration to the top of her
left eye and a bleeding laceration on her forehead, having a "large amount of
dried blood on her face, down in her chest, and her shirt [] ripped off her chest"

11

from what "looked like . . . a struggle." Id. at 331-32. He testified that he "[got]
her to settle down a little bit" because C.B. "was crying and scared." Id. at 332.
Stating that "[t]he apartment was in kind of a state of disarray," Smith noted
that "there was a large amount of dried blood in the living room on the [white]
carpeting" and on the kitchen floor. Id. at 333.

Smith identified photographs of (1) the living room with a bloody carpet,
id. at 335, 337, 343-44; (2) cups and an apparently empty bottle of vodka, id.
at 336-37; (3) the kitchen, id. at 339; (4) a bloody bathroom sink, id. at 340,
342-43; and (5) a "bathtub and bathroom with a vase in the bathtub with blood
on it," id. at 340. Smith also displayed to the jury the bloody vase he recovered
from the apartment, describing it as "pretty heavy." Id. at 346-48. Smith
testified that C.B. "refused to leave the apartment before . . . she locked it." Id.
At the charging conference five days later, C.B. had a black eye and stitches.
Id. at 350. Smith identified photographs of the lacerations on C.B.'s face on the
night of the incident with measuring devices placed alongside. Id. at 352-55.

On cross-examination, the petitioner clarified that Smith (1) did not
know the petitioner on the night of the incident, id. at 357; (2) made no arrests
and recovered no fingerprints on the night of the incident, id. at 358-59; (3)
identified the petitioner through the victim's statements and did not conduct a
photo array; id. at 361; (4) corroborated C.B.'s identification with the
petitioner's birth date, id. at 361-62; he also established that officers did not
get a written statement from C.B., id. at 362.

The court noted that the jurors had two questions for Smith. Id. at 364. First, they asked why officers took no fingerprints from the vase. Id. at 365. Smith stated that they "didn't pull prints off the vase simply because it's a domestic violence case;" he explained that in domestic violence case where the victim knows the actor, the victim can identify the actor "by year, how old they are or by a birth date, and [] the physical description." Id. at 366. The court declined to ask the second question, explaining that sometimes she "legally" could not ask a question. Id.

The State rested, the court excused the jury for a break and the petitioner moved to dismiss the case. Id. at 367. Viewing the evidence in the light most favorable to the State, the court concluded that a jury could find guilt beyond a reasonable doubt and denied the motion. Id. at 368. The court had a final discussion with the parties regarding jury instructions, explaining that it would include the instruction on the lesser included offense of substantial battery. Id. at 370-72. After the jury returned, the court read the instructions. Id. at 375-87. In its closing argument, the State again played 911 call recordings, pausing to emphasize C.B.'s statements (1) that she was "sitting [there] bloodied," id. at 392; (2) that her "ex just beat . . . [her] so bad," id.; (2) describing her address, id.; (3) that she was "scared to go outside [her] door," id.; (4) reiterating that her "ex just beat [her]" and "robbed [her]," id. at 393; (5) stating that her "ex just beat [her] so bad . . . with a vase" and "beat [her] until [she] gave him [her] money," id., (6) identifying herself as C.B., id.,

(7) stating "[m]aybe he'll kill me," id. at 394, and (8) identifying her attacker as "Debradre Jackson," id.

In his closing argument, the petitioner contended that he "didn't even know [C.B.]" and that C.B. never identified him. Id. at 396. He asserted that what he heard C.B. say on the 911 call was "Brandon" and that "couple documents she says Debrandon, too" but that he did not know. Id. He stressed that C.B. never testified and that the State never offered a reason why, and he noted that while "[t]hey" said that he robbed C.B., the State did not establish that she had any property. Id. He argued that the state never proved that he took any property, or even that he knew C.B. Id. at 397. He asserted that the police filed to take fingerprints from the vase or conduct a photo lineup. Id.

After the State's rebuttal, the jury began its deliberations. Id. at 402-03. The court denied the petitioner's motion to dismiss at the close of the State's case. Id. at 403-04. The jury sent a note, asking to "hear the tape"; because it was late in the day, the court indicated that it would excuse the jurors then play the tape for them the following morning. Id. at 405. The next day, the jury wrote a note asking what to do if they could not agree on a verdict. Id. at 410. After a discussion with the parties, the court responded with a note asking the jury to continue its deliberations. Id. at 410-11. At 4:00 that afternoon, the jury stated in a note that it had "voted several times," and could not all agree. Id. at 411. When the court brought the jurors into the courtroom and asked if they were deadlocked, the jurors indicated that they wished to continue deliberating. Id. at 414-15. At 4:08, the jury returned with verdicts of not guilty

14

on the robbery count and guilty on the substantial battery count. Id. at 416-17.

B.    State Postconviction Proceedings

On September 28, 2015, the petitioner filed a motion for postconviction relief under Wis. Stat. Rule §809.30. See State v. Jackson, Milwaukee County Case No. 14CF000267 (available at https://wcca.wicourts.gov). Two weeks later, the circuit court denied the motion. Id.

On direct appeal, the petitioner argued that (1) the evidence was insufficient to support his conviction for substantial battery, (2) the court deprived him of his rights under the Sixth Amendment's Confrontation Clause, and (3) the sentencing court improperly applied a repeater enhancer to his sentence. Dkt. No. 11-3 at 44. He asserted that because the State presented no evidence that he caused or intended to cause substantial bodily harm to C.B., or that he was physically present where the alleged crime took place, the State failed to prove the essential elements of the charged offense, Wis. Stat. §940.19(2). 940.19(2). Id. at 50.

The petitioner contended that the trial court denied his right to confrontation when it admitted recordings of 911 calls made by C.B. Id. at 54. He reasoned that neither C.B. nor the emergency call operator that took one of C.B.'s calls appeared at trial for questioning. Id. He stressed that the State failed to make diligent efforts to produce these witnesses and never properly moved the court to declare the victim unavailable. Id. Disagreeing with the circuit court's conclusion that the evidence fit within a hearsay exception, the

15

petitioner argued that the court should have excluded the call recordings given the unusual circumstances. Id. at 54-55. According to the petitioner, "[t]wo unusual circumstances render[ed] the 9-1-1 call unreliable and warrant[ed] its exclusion." Id. at 55. First, despite the State's belief that she would appear and testify, C.B. was not present at trial and did not provide a sworn statement. Id. Second, the petitioner stressed that the allegations in the 911 call recordings and police reports, including his presence at the crime scene, were "subjective." Id. He reasoned that "[t]he police did not find [the petitioner] present on the scene," and "[the petitioner] did not have the opportunity to question [C.B.] regarding these subjective conclusions." Id.

The petitioner argued that the "question and answer" exchange of the second 911 call was testimonial. Id. at 56 (citing State v. Jensen, 299 Wis. 2d 267 (2007); Giles v. California, 554 U.S. 353 (2008)). According to the petitioner, the State offered the 911 call recordings "for the truth of the testimony of the 2nd 9-1-1 call comparing the name the victim states in the call to [the petitioner's] name without affirmation by [C.B.] or [911 operator] Katherine Fulfer." Id. The petitioner concluded that "the evidence on record [did] not connect [him] to any crime." Id. at 58. He stresses that while C.B. alleged that her "ex" had beaten her, "[t]he State ha[d] not shown any evidence identifying [the petitioner] being the victim 'ex.'" Id. He complained that the State never cleared up the discrepancy between the telecommunicator's transcription of the name that C.B. provided and his name. Id.

The petitioner argued that the State failed to make a showing of a "diligent good faith effort" to produce C.B. before the circuit court found C.B. unavailable and admitted the 911 call evidence. Id. at 59. He asserted that the "State did not move the court by motion to declare the victim unavailable under hearsay exception rule to admit hearsay into evidence." Id. at 61. The petitioner contended that, despite including her on the witness list, the State never produced Fulfer "for testimony as to the foundation for admitting the 2nd 911 call she took." Id. The petitioner claimed that the "[p]rosecution did not carry its burden of demonstrating that [C.B.] nor Katherine Fulfer was constitutionally unavailable for purposes of [his] trial." Id. at 62.

The petitioner contended that the sentencing court improperly applied a penalty enhancer based on prior felony convictions. Id. at 63. He reasoned that the court never received certified copies of the prior judgments of conviction, instead merely taking judicial notice of them. Id. at 63-64.

On October 20, 2016, the Wisconsin Court of Appeals affirmed the conviction and the circuit court's order denying postconviction relief. Dkt. No. 11-3 at 188-89. The court rejected each of the petitioner's claims, concluding that the circuit court did not violate the petitioner's Confrontation Clause rights when it admitted recordings of the 911 calls, that evidence sufficiently supported the petitioner's conviction and that the circuit court properly applied a penalty enhancer at the petitioner's sentencing. Id. at 189.

The Wisconsin Court of Appeals agreed with the circuit court's conclusion that under Davis, the 911 call recordings were nontestimonial; the

17

court was "satisfied that C.B.'s statements to the 911 call operator were made with the intent to resolve the present emergency in which C.B. found herself engulfed, not for purposes of implicating [the petitioner] at a later court proceeding." Id. at 191-92. The court found that the admission of that evidence at trial did not violate the petitioner's Confrontation Clause rights, and that the jury properly heard that evidence. Id. at 192.

The court observed that it "review[s] the sufficiency of the evidence in the light most favorable to sustaining the conviction," id. (citing State v. Hanson, 338 Wis. 2d 243 (2012)), and "sustain[s] the conviction unless 'it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt,'" id. (citing State v. Poellinger, 153 Wis. 2d 493, 501 (1990)). It discussed the circuit court's jury instructions regarding substantial battery:

> The circuit court instructed the jury, without objection, that, in order to convict [the petitioner] of substantial battery, it must find beyond a reasonable doubt (1) that [the petitioner] caused substantial bodily harm to C.B., and (2) that [the petitioner] intended to cause bodily harm to C.B. The court also instructed the jury that "[s]ubstantial bodily harm means bodily injury that requires stitches," and that "[b]odily harm means physical pain or injury, illness or any impairment of physical condition." With regard to intent, the court instructed that the jury is permitted to find "intent" from "the Defendant's acts . . . and from all the facts and circumstances in this case bearing upon intent," and that intent "means the Defendant had the mental purpose to cause bodily harm . . . or was aware that his conduct was practically certain to cause bodily harm." Finally, the jurors were instructed that, in weighing the evidence, they were permitted to "take into account matters of your common knowledge, and . . . observations and experiences in the affairs of life."

18

Id. at 193 (footnote omitted). After examining the trial record, the court concluded that "the State met its burden of proving that [the petitioner] committed substantial battery against C.B. beyond a reasonable doubt." Id.

The court rejected the petitioner's argument that "because C.B. did not appear as a witness at trial, the State [could not] prove its case." Id. at 194. Conceding that one of the 911 call recordings was "somewhat muffled" and that "C.B. [was] difficult to understand at times," the court found that (1) the recording was sufficient to permit the jury to "conclude that C.B. responded 'Debradre Jackson' when asked who her assailant was," and (2) the jury "was free to reject" the petitioner's contention that C.B. identified her assailant as "Brandon." Id.

In the appellate court's view, the evidence was sufficient as to each element of substantial battery. It concluded that the "substantial bodily harm" element was "easily satisfied by the emergency room doctor's testimony that he closed C.B.'s facial lacerations, using nine stitches." Id. As evidence supporting the "bodily harm" element, the court referred to the emergency room doctor's testimony regarding C.B.'s injuries, the police officer's testimony regarding C.B.'s injuries and mental state, photographs depicting C.B.'s injuries and reasonable inferences from the 911 recordings. Id. The court found the causation element "sufficiently supported by C.B.'s 911 call recording indicating that [the petitioner] had hit her with a vase;" it found "C.B.'s statement [] corroborated by the police officer's testimony that the officer discovered a blood-spotted vase at C.B.'s apartment, as well as by the

19

emergency room doctor's testimony that C.B. told him that her ex-boyfriend hit her with a glass vase." <u>Id.</u> at 194-95.

Noting the petitioner's argument that the State had to prove his intent to cause C.B. "substantial bodily harm," the court considered that argument "mistaken." <u>Id.</u> at 195. The court found that the applicable state law and jury instruction required the State to prove that the petitioner intended to cause C.B. "bodily harm." <u>Id.</u> (citing Wis. Stat. §940.19(2). "Thus," the court determined, "the jury was required to determine whether [the petitioner] intended to cause physical pain or injury to C.B., and was advised that it could make this determination by considering [the petitioner's] acts and other surrounding circumstances." <u>Id.</u> The court added that "the jury was advised that it could find the requisite intent if it found either that [the petitioner] had the mental purpose to cause bodily harm to C.B. or that [the petitioner] was aware that his conduct was practically certain to cause C.B. bodily harm." <u>Id.</u> The court found that the evidence supported a finding that the petitioner hit C.B. in the face with a vase that Officer Smith described as "pretty heavy." <u>Id.</u> The court concluded that that fact "g[ave] rise to the reasonable inference that, at the very least, [the petitioner] was aware that hitting C.B. in the face with a heavy glass vase was practically certain to cause C.B. physical pain or injury." <u>Id.</u> The appellate court concluded that "the evidence presented at trial was sufficient to support the conviction for substantial battery beyond a reasonable doubt." <u>Id.</u>

Rejecting the petitioner's penalty enhancer claim, the Court of Appeals concluded that "the circuit court took judicial notice of the proffered certified copy of the Ozaukee County judgment of conviction and properly imposed the repeater penalty enhancer." Id. at 196. It explained that this procedure comported with the applicable state law, and that the trial court properly applied the enhancement. Id. at 196-97 (citing State v. Koeppen, 237 Wis. 2d 418 (Ct. App. 2000)).

After the Court of Appeals affirmed the petitioner's convictions, he filed other postconviction challenges in the Wisconsin courts. On November 15, 2016, the petitioner filed a postconviction motion under Wis. Stat. §974.06. Id. The circuit court denied the motion two weeks later. Id. On December 19, 2016, the petitioner filed another postconviction motion under §974.06 and a petition for review in the Wisconsin Supreme Court. Id. Four days later, the circuit court denied the second §974.06 motion. On January 31, 2017, the petitioner filed a motion for a new trial; the circuit court denied the motion two days later. Id. On February 17, 2017, the petitioner filed a motion to alter the judgment of conviction. Id. The court denied the motion five days later. Id. In March of 2017, the Wisconsin Supreme Court denied review. Id. The petitioner filed another §974.06 motion in July of 2017. Id. The circuit court denied the motion the next day. Id. Two months later, the Wisconsin Supreme Court denied the petitioner's *habeas* petition. Id. In February of 2018, the petitioner filed a fourth §974.06 motion. Id. The court denied the motion the same day.

Id. The petitioner filed motions to reconsider many of the court's decisions denying his postconviction motions, all of which were denied by the courts. Id.

### C. Federal *Habeas* Petition

The petitioner filed his federal *habeas* petition on March 24, 2017. Dkt. No. 1. The petitioner challenged his conviction on grounds that (1) the admission of the 911 call recordings at his trial violated his rights under the Sixth Amendment's Confrontation Clause, (2) the State failed to present sufficient evidence to support his conviction, and (3) investigators violated his due process rights under the Fifth Amendment by failing to collect incriminating evidence. Id. at 6-8.

On August 7, 2017, the court screened the petition under Rule 4 of the Rules Governing Section 2254 Cases. Dkt. No. 6. Finding each of the claims to state grounds generally cognizable on *habeas* review, the court allowed the petitioner to proceed, ordered the respondent to answer or otherwise respond to the petition and set a briefing schedule. Id. at 3-5. The court noted, however, that its screening order did not consider the merits of any of the petitioner's claims. Id.

## II. Analysis

### A. Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant *habeas* relief only if the state court decision was "either (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

United States,' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller v. Smith, 765 F.3d 754, 759-60 (7th Cir. 2014) (quoting 28 U.S.C. §2254(d)(1), (2)).

The Wisconsin Court of Appeals rendered legal conclusions concerning the sufficiency of the evidence presented at trial and the petitioner's rights under the Confrontation Clause. The petitioner challenges those conclusions. A federal court reviews such challenges under 28 U.S.C. §2254(d)(1). Saxon v. Lashbrook, 873 F.3d 982, 987 ("Generally, we review habeas challenges to the sufficiency of the evidence only under §2254(d)(1)") see also Jones v. Butler, 778 F.3d 575, 581-82 (7th Cir. 2015); Redmond v. Kingston, 240 F.3d 590, 590 (7th Cir. 2001) (considering *habeas* petitioner's Confrontation Clause claim under §2254(d)(1)). That subsection allows a court to grant *habeas* relief only where it finds that the state court's application of federal law was "objectively unreasonable." Renico v. Lett, 559 U.S. 766, 773 (2010). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" Id. (quoting Williams v. Taylor, 529 U.S. 362, 410 (2000)). "The standard under §2254(d) is 'difficult to meet' and 'highly deferential.'" Saxon, 873 F.3d at 987 (quoting Cullen, 563 U.S. at 181).

B.     Confrontation Clause Claim

"The Confrontation Clause of the Sixth Amendment provides: 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted

with the witnesses against him.'" <u>Davis</u>, 547 U.S. 813. The Confrontation
Clause bars the admission of a witness's testimonial statement when that
witness does not appear at trial "unless he was unavailable to testify, and the
defendant had had a prior opportunity for cross-examination." <u>Id.</u> (citing
<u>Crawford v. Washington</u>, 541 U.S. 36, 53-54 (2004)). Only testimonial
statements, however, "cause the declarant to be a 'witness' within the meaning
of the Confrontation Clause." <u>Id.</u> (citing <u>Crawford</u>, 541 U.S. at 51).
Nontestimonial statements, "while subject to traditional limitations upon
hearsay evidence," do not implicate the Confrontation Clause. <u>Id.</u>

      Generally, statements are nontestimonial "when made in the course of
police interrogation under circumstances objectively indicating that the
primary purpose of the interrogation is to enable police assistance to meet an
ongoing emergency. They are testimonial when the circumstances objectively
indicate that there is no such ongoing emergency, and that the primary
purpose of the interrogation is to establish or prove past events potentially
relevant to later criminal prosecution." <u>Id.</u> at 822. "A 911 call . . . , and at least
the initial interrogation conducted in connection with a 911 call, is ordinarily
not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe
current circumstances requiring police assistance." <u>Id.</u> at 827.

      The <u>Davis</u> court laid out factors for a court to consider in determining
whether a statement is testimonial. A statement is more likely nontestimonial
when (1) it describes "events *as they were actually happening*, rather than
"describ[ing] past events," <u>id.</u> (citing <u>Lilly v. Virginia</u>, 527 U.S. 116, 137 (1999))

24

(emphasis in original); (2) "any reasonable listener would recognize that [the caller] was facing an ongoing emergency, id.; (3) "the nature of what was asked and answered [], . . . viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn . . . what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon," id. (citing Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty., 542 U.S. 177, 186 (2004)) (emphasis in original); and (4) "frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe," as opposed to "responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers," id.

The petitioner argues that, standing alone, the fact that C.B. did not testify at his trial violated his rights under the Confrontation Clause. Dkt. No. 14 at 6 (citing Higgins v. Renico, 362 F. Supp. 2d 904 (E.D. Mich. 2005)). He argues that despite the trial court's conclusion that the second 911 call was nontestimonial, its admission implicated the Confrontation Clause because the State's goal was to relay to the jury that the caller mentioned the petitioner's name three times. Id. at 7. He asserts that the circuit court denied him his Confrontation Clause rights because it admitted the 911 call recordings "without allowing him the opportunity to face the adverse witness face to face so that he could show the jury he was misidentified." Id. Conceding that "9-1-1

25

call recordings are not testimonial pursuant to <u>Davis,</u>" the petitioner contends that "[t]he second recording where it is mentioned 3 times a name similar to [the petitioner's] name should had not been heard over [his] objection, as it has a likelihood of misidentification by the witness, and the only way to test the evidence was through cross-examination of the adverse witness, as the State implies that it is [the petitioner] to the jury and that the victim said so 3 times." <u>Id.</u> (citing <u>U.S. v. Sophie</u>, 900 F.2d 1064, 1077 (7th Cir. 1990)).

The respondent contends that the Court of Appeals reasonably rejected the petitioner's Confrontation Clause claim because the 911 calls were nontestimonial under <u>Davis</u>, 547 U.S. 813. Dkt. No. 16 at 8. The respondent asserts that nontestimonial hearsay is unconstrained by the Sixth Amendment's Confrontation Clause. <u>Id.</u> (citing <u>United States v. Ellis</u>, 460 F.3d 920, 923 (7th Cir. 2006)). According to the respondent, the Court of Appeals "articulated the proper legal principles" concerning whether a 911 call is testimonial for purposes of the Confrontation Clause when the court discussed <u>Davis</u> and related cases. <u>Id.</u> at 9. The court reasonably applied those principles when it concluded that the admission of the 911 calls did not violate the petitioner's rights under the Confrontation Clause. <u>Id.</u>

This court agrees that the Wisconsin Court of Appeals reasonably applied <u>Davis</u>, 547 U.S. 813, when it rejected the petitioner's Confrontation Clause claim. The court reasonably considered the circumstances of C.B.'s 911 calls and concluded that they were nontestimonial for the purposes of the Confrontation Clause. In her 911 calls, C.B. claimed that an ex-boyfriend had

26

just robbed her and beat her with a vase, that she was afraid to go outside of her apartment and that she was afraid her ex-boyfriend might kill her. Dkt. No. 11-4 at 392-94. The court is satisfied that C.B.'s primary purpose when making those calls—including when she gave police her address and identified her assailant—was to enable police assistance to address and resolve an ongoing emergency. Under <u>Davis</u>, the admission of the 911 calls at trial did not violate the petitioner's rights under the Confrontation Clause, and the jury properly heard those calls.

     C.    <u>Sufficiency of the Evidence Claim</u>

"The applicable Supreme Court precedent regarding the sufficiency of the evidence is well-established: 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" <u>Saxon</u>, 873 F.3d at 987-88 (quoting <u>Jackson</u>, 443 U.S. at 319 (emphasis in <u>Jackson</u>)).

> Thus, habeas reviews of *Jackson* claims are subject to two levels of judicial deference creating a high bar: first, the state appellate court determines whether any rational trier of fact could have found the evidence sufficient; second, a federal court may only overturn the appellate court's finding of sufficient evidence if it was objectively unreasonable.

<u>Id.</u> (citing <u>Coleman v. Johnson</u>, 566 U.S. 650, 651 (2012)).

The Court of Appeals explained that it "review[s] the sufficiency of the evidence in the light most favorable to sustaining the conviction, . . . and will sustain the conviction unless 'it can be said as a matter of law that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.'" (quoting <u>Poellinger</u>, 153 Wis. 2d at 501) (other citation omitted). The Seventh

27

Circuit has observed that Poellinger's statement of the standard of review for a sufficiency of the evidence claim "effectively duplicates the Supreme Court standard for sufficiency challenges." Adams v. Bertrand, 453 F.3d 428, 432 (7th Cir. 2006) (citing Jackson v. Virginia, 443 U.S. 307, 324 (1979) (referencing Supreme Court standard)). "[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). A reviewing *habeas* court "cannot choose the evidence it prefers to emphasize or make its own credibility determinations." Ford v. Ahitow, 104 F.3d 926, 939 (7th Cir. 1997); see also Jones v. Barnett, 215 F.3d 1330 (Table), 1998 WL 778307, at *4 (7th Cir. 1998) ("It is not our province to second-guess credibility determinations made by the finder of fact.")

A federal court analyzes the sufficiency of the evidence underlying a state criminal conviction by looking to the substantive elements of the underlying criminal offense. Jackson, 443 U.S. at 324, n.16 ("the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.") The jury found the petitioner guilty of substantial battery in violation of Wis. Stat. 940.19(2). Dkt. No. 11-2 at 44. Under Wis. Stat. 940.19(2), "[w]hoever causes substantial bodily harm to another by an act done with intent to cause bodily harm to that person or another is guilty of a Class I felony." In its decision affirming the petitioner's conviction, the Wisconsin Court of Appeals stated that

> [t]he circuit court instructed the jury, without objection, that, in order to convict [the petitioner] of substantial battery, it must find

28

beyond a reasonable doubt (1) that [the petitioner] caused substantial bodily harm to C.B., and (2) that [the petitioner] intended to cause bodily harm to C.B. The court also instructed the jury that "[s]ubstantial bodily harm means bodily injury that requires stitches," and that "[b]odily harm means physical pain or injury, illness or any impairment of physical condition." With regard to intent, the court instructed that the jury is permitted to find "intent" from "the [petitioner's] acts … and from all the facts and circumstances in this case bearing upon intent," and that intent "means the [petitioner] had the mental purpose to cause bodily harm … or was aware that his conduct was practically certain to cause bodily harm." Finally, the jurors were instructed that, in weighing the evidence, they were permitted to "take into account matters of your common knowledge, and … observations and experiences in the affairs of life."

Dkt. No. 11-3 at 193.

After reviewing the trial record, the Court of Appeals held that "the State met its burden of proving that [the petitioner] committed substantial battery against C.B. beyond a reasonable doubt." Id. The petitioner asserts that "[t]he State did not have sufficient evidence to convict [him] of Substantial Battery." Dkt. No. 14 at 8. The petitioner appears to argue that (1) the trial court erroneously admitted the 911 call recordings, and (2) had the court not admitted the 911 call recordings, the remaining evidence would have been insufficient to support the conviction. Id. The petitioner stresses that "[t]he constitution protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting the introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." Id. (citing Perry v. New Hampshire, 565 U.S. 228, 237 (2012)).

29

The respondent states "[b]ecause the Wisconsin Court of Appeals employed and identified the controlling federal standard, its decision cannot be deemed contrary to federal law." Id. at 12. The respondent says that the Court of Appeals reasonably applied the Jackson standard when it concluded that the evidence was sufficient to support the petitioner's conviction. Id. at 13. The respondent reasons that (1) the Wisconsin Court of Appeals noted the circuit court's instructions to the jury as to what the jury must find in order to convict the petitioner of substantial battery, id.; (2) those instructions were correct, id.; (3) the Wisconsin Court of Appeals "examined the evidence presented at trial and concluded that it was sufficient to support the conviction" beyond a reasonable doubt, id. at 13-15. On *habeas* review, the respondent asserts, this court applies a "double dose of deference" to the Wisconsin Court of Appeals' decision. Id. at 15.

The Wisconsin Court of Appeals identified and reasonably applied the United States Supreme Court precedent controlling an insufficiency of the evidence claim. The jury had sufficient evidence to support its verdict. The parties stipulated at trial that the petitioner's name was Debradre Jackson. Dkt. No. 11-4 at 260-61. Officer Smith corroborated the name that C.B. gave him during the investigation with the petitioner's date of birth. Id. at 360-61. While the petitioner argues that the 911 call was unreliable and that the trial court should not have allowed the jury to hear it, dkt. no. 14 at 8, this court has found that the publication of the 911 call at trial did not violate the petitioner's rights under the Confrontation Clause. Given that and other

30

evidence—including Dr. Tews's testimony that C.B. received nine stitches on her face—a rational trier of fact could conclude that the petitioner caused C.B. substantial bodily harm and intended to cause C.B. bodily harm.

Even if the 911 call recording was less than perfectly clear, the Court of Appeals clarified that "the recording is sufficient to, at the very least, permit the jury to conclude that C.B. responded 'Debradre Jackson' when asked who her assailant was." Dkt. No. 11-3 at 194. As the Court of Appeals determined, "[t]he jury [] was free to reject [the petitioner's] rendition of the name of the assailant C.B. offered, and did." Id. It is not this court's role to second-guess the jury's determinations as to the reliability or credibility of the evidence. It is this court's role to examine whether the Wisconsin Court of Appeals unreasonably applied United States Supreme Court precedent regarding the sufficiency of the evidence. It did not.

D.    Due Process—Identification Claim

Under AEDPA, a state prisoner must exhaust available state court remedies before a district court will consider the merits of a constitutional claim in a federal *habeas* petition. 28 U.S.C. §2254(b)(1)(A). The exhaustion requirement provides the state courts an opportunity to correct alleged violations of the federal constitutional rights of its own prisoners. Bolton v. Akpore, 730 F.3d 685, 694 (7th Cir. 2013). To exhaust a claim, a petitioner must first raise the claim in state court "to fairly alert the state court to the federal nature of the claim and to permit that court to adjudicate squarely that federal issue." Weddington v. Zatecky, 721 F.3d 456, 465 (7th Cir. 2013)

31

(quoting Villanueva v. Anglin, 719 F.3d 769, 775 (7th Cir. 2013)). The petitioner must "fairly present" the claim in each level of state court. Bolton, 730 F.3d at 694-95. A "failure to present fairly each habeas claim in state court 'leads to a default of the claim[s] and bar[s] the federal court from reviewing the claim[s'] merits.'" Weddington, 721 F.3d at 456 (quoting Smith v. McKee, 598 F.3d 374, 382 (7th Cir. 2010)). The law refers to this circumstance as "procedural default."

If a court determines that a petitioner's claim is procedurally defaulted, it must consider whether to excuse the default. Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991). A court may excuse default if the petitioner can show either (1) cause for the default and resulting prejudice, or (2) that the failure to consider the federal claim will result in a fundamental miscarriage of justice. Id. at 750 (citations omitted). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." Murray v. Carrier, 477 U.S. 478, 488 (1986). To show that a miscarriage of justice will occur if the court were to deny *habeas* relief, a petitioner must show that he is actually innocent of the offenses for which he was convicted. Hicks v. Hepp, 871 F.3d 513, 531 (7th Cir. 2017). A petitioner asserting actual innocence as a gateway to a defaulted claim "must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt.'" House v. Bell, 547 U.S. 518, 536-37 (2006) (quoting Schlup, 513 U.S. at 327).

The petitioner appears to recognize that he raises his due process claim for the first time in his federal *habeas* petition, and states that it "is subject to review under the standards pursuant to" <u>Murray</u>, 477 U.S. 478. Dkt. No. 14 at 9. He argues that there is a reasonable probability of a more favorable verdict "had a proper Due Process procedure been conducted to identify [the petitioner] as the person who committed this crime," and that he is actually innocent. <u>Id.</u> The petitioner contends that "[u]nder this standard [he] ha[s] not procedurally defaulted this . . . claim." <u>Id.</u> (citing <u>Kuhlmann v. Wilson</u>, 477 U.S. 436 (1986)). He asserts that

> [t]here is no evidence that the victim identified [the petitioner] as the person that Robbed her and beat her.
>
> The prosecutor based its case on [the petitioner] having a unique name and that the victim says the name in the (9-1-1) call no less than three times. The 9-1-1 call is the only evidence the prosecutor used as identification of the person who done the crime, without the victim to testify and identify [the petitioner] as such.

<u>Id.</u> at 10. Stating that "[o]n the 9-1-1 call played for the jury, the caller named the person who assaulted her as the operator understood 'Debramdon,'" the petitioner questions how the jury could "get a positive I.D. from the recording" when the telecommunicator could not. <u>Id.</u> He contends that "[i]f no identification procedure was utilized to affirm the identity of the person who assaulted C.B. it was fundamentally unfair as to deprive [the petitioner] of Due Process of law." <u>Id.</u> (citing <u>LeBarron v. Burke</u>, 314 F. Supp. 657 (W.D. Wis. 1970)). He concludes that "[t]he steps taken regarding the identification of [the petitioner] was unconstitutional," finds no evidence in the record that he "is the

33

ex-boyfriend who committed this crime against [C.B.]" and reiterates that he is innocent. Id.

 The respondent states that because the petitioner "never presented a due process claim to any Wisconsin court," he has procedurally defaulted the claim. Dkt. No. 16 at 15. at 17. The respondent notes that the petitioner conducted extensive postconviction litigation, including a direct appeal, a *habeas* petition in the Wisconsin Supreme Court, motions to amend the judgment of conviction, collateral challenges under Wis. Stat. §974.06, a motion for reconsideration and motions for a concurrent sentence. Id. at 18. The respondent stresses, however, that the petitioner "failed to raise his due process claim in any of these motions or in any of his state court proceedings." Id. The respondent argues that under Momient-El v. De Tella, 118 F.3d 535, 539 (7th Cir. 1997), even if all of the facts necessary to state the federal claim were before the Wisconsin courts, or if the petitioner asserted a similar claim, the petitioner still procedurally defaulted his claim. Id. at 18-19. And, he argues, "[t]he facts of [the petitioner's] case did not call to the Wisconsin courts' mind any theory of a due process violation." Id. at 19. The respondent concludes that because the petitioner represented himself "in his state postconviction motion and his state habeas petition, he cannot claim cause to excuse his procedural default." Id.

 The petitioner procedurally defaulted on any due process claim related to an identification procedure. On direct appeal, the petitioner asserted a violation of his rights under the Confrontation Clause, insufficiency of the evidence and

34

that the trial court improperly applied a penalty enhancement at sentencing. Dkt. No. 11-3 at 44. The petitioner did not raise a separate due process claim regarding an identification procedure. The petitioner has not alleged cause to excuse his procedural default. Although he states that he is actually innocent of substantial battery, he has presented no evidence to support that claim, much less "new reliable evidence" showing that "it is more likely than not that no reasonable juror" would have found the petitioner guilty of substantial battery beyond a reasonable doubt. Bell, 547 U.S. at 536-37 (quoting Schlup, 513 U.S. at 327).

Even if it was proper for this court to reach the merits of the petitioner's due process claim, it would deny relief. Officer Smith testified that after C.B. identified the petitioner by name, officers corroborated the name with his birth date. Dkt. No. 11-4 at 361-62. The petitioner cross-examined Smith regarding things Smith failed to do, including obtaining a written statement or conducting a photo array. Id. The jury apparently credited Smith's testimony that he corroborated the petitioner's relatively unique name with a date of birth. While the State's case might have been stronger with a written statement and a photo identification, this court cannot say as a matter of federal constitutional law that the trial court violated the petitioner's right to due process when it accepted the jury's verdict. This court is not aware of, and the petitioner does not present, any United States Supreme Court precedent clearly establishing that when a jury convicts a petitioner of a crime based on the

35

petitioner's identification through his name and birth date, the trial court violates a petitioner's right to due process.

The court will deny the petition.

## III. Certificate of Appealability

Under Rule 11(a) of the Rules Governing Section 2254 Cases, the court must consider whether to issue a certificate of appealability. A court may issue a certificate of appealability only if the applicant makes a substantial showing of the denial of a constitutional right. See 28 U.S.C. §2253(c)(2). The standard for making a "substantial showing" is whether "reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotations omitted). The court declines to issue a certificate of appealability, because reasonable jurists could not debate the petitioner's procedural default or the court's decision to deny the petition on the merits.

## IV. Conclusion

The court **DENIES** the petition for writ of *habeas corpus* and **DISMISSES** this case. Dkt. No. 1. The clerk will enter judgment accordingly,

The court **DECLINES** to issue a certificate of appealability.

Dated in Milwaukee, Wisconsin this 30th day of November, 2020.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**Chief United States District Judge**

36